## SPRINGS v. BROWN et al.

### (Circuit Court, D. South Carolina. November 7, 1899.)

1. INDEMNITY—BOND TO INDEMNIFY SURETY—EXTENT OF LIABILITY THEREON.
   Where a bond is given to a surety for the expressed purpose of counter security against the liability assumed by him, the liability of the maker thereon is commensurate with the liability of the surety, although, by its terms, the bond expires before the contract on which the surety is bound fully matures.

2. SAME—CONTRIBUTION BETWEEN INDEMNITORS.
   Where two persons each deposit securities for the indemnification of a surety, and the liability is paid from the securities furnished by one alone, he may enforce contribution from the other; the liability of each being in proportion to the relative amount of the securities furnished by him.

3. SUBROGATION—USE OF BORROWED MONEY—RIGHTS OF LENDER.
   One who loaned securities to another personally, with no agreement as to their use, acquires no equity in property of a third person by reason of the fact that the borrower voluntarily paid off an incumbrance thereon from the proceeds of such securities.

This was a suit in equity to enforce contribution between two indemnitors of a surety and for other relief.

J. E. Burke and A. D. Cohen, for complainant.

G. M. Trenholm and J. P. K. Bryan, for defendants.

SIMONTON, Circuit Judge. The exhaustive argument of this case by the counsel on both sides has materially aided the court in reaching its conclusion. Mike Brown, the husband of the defendant Mrs. Jennie Brown, desired to construct an extension of the Carolina Midland Railroad. He negotiated with the company for a lease of this road, and secured the lease, provided he could give satisfactory security for the performance of the covenants thereof. To this end he applied to the Baltimore Banking & Trust Company, now known as the American Bonding & Trust Company of Baltimore City, to guaranty him in such performance. This last-named company undertook to do this, provided it was furnished with satisfactory counter security. Brown tendered the bond of his wife in the penal sum of $20,000, secured by a mortgage of a tract of land in and near the town of Barnwell, S. C. This was not deemed sufficient. Just at this time Brown formed the acquaintance of J. L. Villalonga, a young man who had recently entered into a moderate fortune, and who desired to enter into some business. In an interview with Villalonga in New York, in which he stated the outline of his project, and of the necessity for counter security to the bonding company, Villalonga then agreed to give the necessary security. Carrying out this agreement, he went with Brown to Charleston, and there met Mr. Mordecai, who was the attorney in fact of the bonding company. Villalonga produced before Mr. Mordecai five registered bonds of the state of Georgia,—Nos. 1, 2, 3, 4, and 5, respectively,—each for $5,000. These were then and there transferred to Brown. Brown used three of them—Nos. 1, 2, and 3—for the security of the bonding company, adding thereto the bond and mortgage of Mrs. Jennie Brown, above spoken of,

making in all $25,000. This was on January 11, 1896. At the same time was produced the lease of the Carolina Midland Company to the corporation obtained by Brown, known as the Greenwood, Anderson & Western Railway, which was the proposed extension of the Carolina Midland Railroad. Mr. Mordecai, as attorney in fact of the bonding company, signed its bond to the Carolina Midland Company, securing the performance of the covenants in the lease. All the papers produced that day bore the same date, January 11, 1896,—Mrs. Brown's bond and mortgage, the lease, the power of attorney to Brown by Villalonga allowing the use of the bonds, and the guaranty of the bonding company. But counsel for the Carolina Midland Company preferred that the obligation of the bonding company should be executed by its president and secretary; so all the papers were put in escrow until such signatures could be obtained. They were obtained, and the papers were duly delivered.

It will be noted that, although Villalonga produced and transferred to Brown five registered bonds of the state of Georgia for $5,000 each, Brown used only three of them for this purpose. The two others he used for his own purposes,—as he says, borrowed them from Villalonga. Counsel for complainant speak of this as a forced loan. Still it was a loan, and Villalonga apparently acquiesced in it. Brown promised to pay them, and also promised to give a bond and mortgage of his wife and secure the loan. These were never performed. Still it does not change the character of the transaction; it remained a loan. It is said that Villalonga promised and agreed with Brown that his three bonds so given as security to the bonding company should be first exhausted to the exoneration of his wife's bond. This Villalonga denies. The question here is as between Villalonga and Mrs. Brown. He certainly never made any such agreement with her personally; and if Brown, acting as her general agent, received such a promise, it was wholly without consideration, and is void. The securities being thus deposited with the bonding company were Mrs. Brown's bond and mortgage and the three Georgia bonds of Villalonga. They were all hypothecated, and the property of the bonding company in them was qualified. The coupons of his bonds were regularly given to Villalonga, and he was recognized as their owner. The bonds of Villalonga were used by the bonding company. They were sold, and the proceeds were applied to the account of the bonding company with the Greenwood, Anderson & Western Railway. Mrs. Brown's bond is intact. Villalonga, before this suit began, made a full and complete assignment of all his interests and equities growing out of this transaction to the complainant. The complainant now seeks contribution from Mrs. Brown.

There can be no doubt that the bonding company held the Brown bond and the Villalonga bonds as security for the same liability,— the performance of all the covenants in the lease. The covenants alleged to have been broken were to pay one year's rent and the interest and taxes. The rent was payable in two semiannual installments; one on the 15th of July, the other on the 15th of Jan-

uary. It is said that the bond and mortgage of Mrs. Brown bore date January 11, 1896, and was for one year; that only one installment of rent was due in that year,—that is, the installment of July 15th,—and that she is not responsible for the installment payable January 15th. This position is not reconcilable with the contract made by her with the bonding company. She expressly covenants to counter secure them in their contract with the Carolina Midland Company, and that bound them to pay one year's rent. By the terms of the lease that year was up on January 11th. The last installment of rent for it was earned, although it was payable on January 15th. These two classes of securities being both held for the same liability, there necessarily arises between them the equity of contribution. McDonald v. Magruder, 3 Pet. 470. The dealing of the bonding company makes inquiry into this matter a little intricate. In addition to these securities, the bonding company had an agreement with the Greenwood, Anderson & Western Railway that it would pay into the hands of the bonding company $1,000 per month, and this was done for eleven months. When the first installment of rent became due, on July 15, 1896, the railway company had paid to the bonding company, and it had in hand, $6,000 of the $10,000 due. The difference—$4,000—was paid by the bonding company, and on one of the exhibits it is called an advance. Counsel for complainant say this was an advance, to be repaid by the following monthly installments. But in October, 1896, Villalonga executed another power of attorney to Mike Brown, authorizing him to use his three bonds, then with the bonding company. And he also executed another instrument authorizing these three bonds to be used as security for a loan or debt of the Greenwood, Anderson & Western Railway Company to the bonding company. There can be no doubt of the purposes of those papers. Mr. Stone, the secretary of the bonding company, says that they were intended to cover this $4,000 transaction, and also a proposed loan of $8,000, which never was consummated. So it clearly appears that this was not an advance to be repaid out of monthly-installment payments, but a loan. It also appears from this fact: When the October transaction took place, the bonding company had already received in monthly installments from the railway $1,000 for the months of August, September, and October; in all, $3,000. Yet in October the amount of $4,000 was treated as a still existing debt. So, also, that $4,000, with $79.32 interest, was paid January 4, 1897. This interest—$79.32—is a little more than three months' interest; that is to say, from October, 1896. As has been seen, the railway company paid the first installment of rent out of its advances and the money borrowed from the bonding company. So there was no default. In January, 1897, on the 5th, 8th, and 11th, the bonding company paid the taxes on the railway property under the terms of its guaranty,—$371.52, $2,293.19, $983.14; in all, $3,647.85. It had, however, in hand cash advanced by the railway company, $1,000 each month for August, September, October, November, and December,—five months,—$5,000. These taxes were paid from this mon-

ey, leaving a balance to credit of the railway company of $1,352.15. On January 4th they sold one of Villalonga's bonds, evidently under the authority of October, 1896, and received $5,500. This met the $4,000 loan, with interest, leaving to credit $1,470.67. On the 13th of January the bonding company sold the other two bonds of Villalonga for $11,100, and on January 15th paid the installment of rent due, $10,000, leaving to credit $1,000. Now, the bonding company, having been supplied with money of the railway company to pay taxes, incurred no liability on that account. On the contrary, it had on hand a remainder of $1,352.25. When the rent was to be paid,—$10,000,—it could apply to this the $1,352.15, leaving of its entire liability $8,647.85. This is the amount which the bonding company paid on its obligation for which Mrs. Brown and Villalonga were sureties,—$8,647.85,—and for which Mrs. Brown must make contribution, as Villalonga's bonds paid it. When the contract was made in January, 1896, Mrs. Brown deposited $10,000 of security and Villalonga $15,000. This fixed the relative proportion of their liability. Although afterwards the bonding company and Villalonga diverted the purpose of these securities, and so one of the bonds was used to secure the loan, still this cannot affect her rights or increase her responsibility. The loss must be borne between them in the proportion of 15 to 10,—Villalonga 60 per cent., she 40 per cent. A decree can be entered in favor of complainant against Mrs. Jennie Brown for 40 per cent. of $8,647.85, with interest.

There is another question: When Brown borrowed the two other Georgia bonds from Villalonga, he used one of them in paying off a mortgage upon his wife's property which she was offering as security to the bonding company. When he borrowed the bonds, he did not declare his purpose to Villalonga. The conclusion of fact expressed above is that this was a loan to Brown personally. If this be so, Villalonga has no equity growing out of the use of the money. Besides this, there is no direct evidence that Brown was the agent of his wife in the transaction. She had executed and delivered to him her bond and mortgage to the bonding company. By this act she constituted him her agent for the purpose of delivering them to the bonding company as the property stood. We cannot, by implication, extend the authority further. Villalonga never discussed the matter of the mortgage with Mrs. Brown. He owed no duty—was under no obligation—with regard to the property. If he had, as his own voluntary act, paid off the mortgage, he would not have been entitled to be subrogated to its security. A fortiori, if Brown, his donee, did so, that would give him no equity. Nor was there any implied trust, as between him and Brown, that this incumbrance be removed. Brown took or borrowed the bonds saying nothing of his purpose, if he had any purpose. After he had used the bonds, he told what he had done with them, and promised to make them good. That created no trust. No relief can be given in this suit for the bonds Nos. 4 and 5.

Let a decree be drawn in accordance with this opinion, defendants to pay the costs.